## Staunton.

### SWITZER v. McCULLOCH.

#### September 28, 1882.

1. EQUITABLE JURISDICTION—*Trespass, &c.*—*Injunction.*—A court of equity will enjoin nuisance, trespass and the like, in order to restrain irreparable mischief, suppress oppressive litigation, or prevent multiplicity of suits. And a bill to enjoin the construction and maintenance of a mill-dam, is not demurrable because it contains no allegation that complainant's right has been established in a suit at law.

2. FORMER JUDGMENT—*Compromise*—*Case at bar.*—Over Co.'s land ran a creek which supplied the mill of N, who, under muniments of title, owned "the ditch which conducted the water to his mill, and the entire and exclusive use of the water and the dam by which the water is raised from the creek to the ditch." C changed the channel of the creek. Thereupon, N built a *new* dam across the creek just below the mouth of the ditch. At law M, the grantee of C, sued N for damages for the injury from the overflow caused by the new dam, but was cast. N then threatened suit for damages for the injury from the change of the channel. By written compromise M stipulated to pay a sum of money to N, who agreed at his own costs to restore the water-flow and release all damages; his rights to the water to remain as before. But instead of restoring the water-flow by rebuilding and maintaining the original dam, N continued to maintain the new dam. M obtained an injunction to prevent this. N pleaded the judgment at law as a settlement of the rights of the parties.

HELD:

> The compromise after the judgment at law, remitted the parties to their original rights as before the change of the creek's channel. These rights were not affected by the judgment at law. And N hath the right to the ditch whereby the water is conducted to his mill, and the entire and exclusive use of the water which could be raised into the ditch by means of the original dam, and nothing more.

Appeal of Newton Switzer from decree of circuit court of Botetourt county, rendered October, 1880, in chancery suit of Madison McCulloch, the grantee of C. C. Spears, against him. The object of the suit, and the pleadings and the facts are fully stated in the opinion; but the compromise in writing therein referred to is in the words and figures following, to-wit:

Whereas a change was made by C. C. Spears in his lifetime in the channel of Mill creek, just above the mill-dam of Switzer & Waskey, which it is claimed by the latter has resulted injuriously to their water supply, and since the death of Spears, M. McCulloch has become the owner of the tract of land on which the said mill-dam is situated; and claim having been set up by Waskey & Switzer for compensation for the injury mentioned, and also for the *restitution of the channel and flow of the water*, as it was before the said change was made—this agreement of compromise of all matters pertaining thereto has been made, between the said Switzer & Waskey and the said McCulloch and W. A. Glasgow, executor of C. C. Spears, viz: That the said Switzer & Waskey, on their part will at their own costs and charges *restore their water-flow* and acquit and release all claims for injury thereto, now and hereafter, and the said McCulloch and Glasgow, executor, on their part, in consideration of the premises, agree to pay to Switzer & Waskey $500, and also in addition to the costs lately adjudged in their favor against the said McCulloch in an action of damages in the county court of Botetourt, the said McCulloch & Glasgow, agree to pay a fee of $100 to William M. Lackland and J. W. Johnston each—they being the counsel of Switzer & Waskey in the said suit. It is farther agreed that McCulloch will remove his fence off the bank of the mill-race from the present water-gate at the lower end of the garden near the turnpike road, so as not to interfere

with the cleaning out of. the race; McCulloch to place the fence either below the bank or to transfer it to the side of race next the turnpike from the lower end of the garden as far down the race as a large walnut tree which stands on the east side of the race; in which event the water-gate would be removed down to that point.

This compromise and settlement, it is understood, is an adjustment of the whole matter of differences between the parties respecting the water-rights mentioned. And while in future *the rights* of Switzer & Waskey respecting the water are *not to be impaired by anything that has passed,* so in the enjoyment of the same, and to *repair and keep the same in order,* respect is to be had to the property of McCulloch, and the same to be done without any *more injury thereto than may be necessary*—it being understood that the rights to the water remain to said Switzer & Waskey, as before the said change and unaffected thereby.

Given under our hands, this 1st day of September, 1871.

W. A. GLASGOW,
Ex'or of C. C. Spears.
MADISON McCULLOCH,
NEWTON SWITZER.

*G. W. & L. C. Hansbrough* and *J. H. H. Figgatt,* for the appellant.

I. The court below erred in overruling the demurrer. This bill presented no case for equity jurisdiction.

1. If there was an invasion of, and an injury to; complainant's rights as owner of the land circumjacent to Mill creek, wherein appellant's water rights existed, the complainant had an adequate remedy at law. High on Inj'rs, § 459.

Equity will not interfere even "to prevent a multiplicity of suits," if the continuing injury be a repetition of the

same trespass by the same person and the same be compensable in damages. *Ib.*

2. Equity will only interfere where complainant's title is *clear* and has been established by legal adjudication, and the injury is irreparable.. *Ib.* § 460. It is not sufficient merely "to state that the injury is irreparable, when the facts show that it is susceptible of adequate pecuniary compensation in damages. *Ib.* §§ 35, 460.

3. The necessity for the interpretation of the instruments of writing (not wills nor trust deeds) creating and defining the respective rights and titles of the parties, cannot be relied on to give jurisdiction to equity, because a court of law is as competent to interpret such instruments as a court of equity, *and more so*, because. the questions are not of equity, but of law, which arise as to the extent of the water rights of appellant and of the land rights of appellee; and in the action of trespass between these parties (which is mentioned both in the pleadings and in the evidence as having occurred as to this same subject matter of litigation) the court of law must have had to interpret the same muniments of title and decide the same questions.

4. In case at bar the alleged right of the complainant was not clear. He prays the court of chancery judicially to interpret the muniments of title and instruct the parties as to their rights respectively. The alleged damage was merely an injury to land compensable with money, and though the damage was alleged to be continuing, it was only so by the repetition of the same trespass by the same person.

Had appellee obstructed the water flow to appellant's mill, and thereby permanently deprived him of the power to propel his machinery, the authorities show that *to protect such easements*, if the title thereto was clear and the facts definitely ascertained, equity would assume jurisdiction. See Angell on Water Courses, § 444, *et seq.*, and especially

§ 452, where it is said: " But unless the plaintiff's title appears on the face of the bill to be fully established, the defendant may demur to the bill for want of equity." "Equity will not assume jurisdiction to restrain a mere trespass fully remediable at law, especially where the title is admitted not to be clear, but to need judicial interpretation." "In all cases in which doubt exists as to the legal right, a court of equity will compel parties to go to trial at law." *Ib.* §§ 449, 452. *Here the doubt is confessed and interpretation prayed for.*

II. The court below erred in ignoring and failing to sustain appellant's *plea of "former judgment,"* which was informally, but distinctly and sufficiently set up and pleaded in his answer as a full and final bar to the claim of complainant in this suit; which plea is, in point of fact, maintained by the pleadings, the evidence, and the opinion of the court below.

1. Appellant had erected two dams (one at the head of the Spears' cut and one at the head of the ditch), and dug and hauled to repair them.

2. Complainant considered the erection and repair of those dams an unlawful invasion of and injury to his lands, and brought his action of trespass therefor.

3. At the trial on the merits, the judgment was "not guilty"; not that appellant had not erected, &c., the dams, for he admitted the charge, but that the court of law, by its judgment in that action, decided that by erecting and digging and hauling to repair those dams, petitioner had not been guilty of any trespass on the rights of complainant. It was "*damnum absque injuria.*"

4. In complainant's bill in this suit in equity, the burden of complaint is identically the same—to-wit: that petitioner erected those dams, &c., and by so doing committed an unlawful invasion of and an irreparable injury to the lands of the complainant. The parties are the same and the

subject matter of litigation the same. Nothing more is required to make the former judgment a full and final bar to the complainant's bill. See Story's Eq. Pl. § 780; 2 Phil. Ev. p. 21.

5. It is not enough to reply that another forum is sought for sake of another remedy; a court of law for its judgment for pecuniary damages; a court of equity for its decree of injunction and abatement.

6. The question *in limine,* in either forum, is the same. "Did petitioner have lawful authority to erect the dams and dig and haul to repair them?" "Did his muniments of title vest in him such authority?"

The honorable judge of the circuit court began his opinion in this cause with the statement that such was the question. He says, "this is a controversy—the main object of which is to have determined the extent of Switzer's rights." *Was not such in reality the object of the action of trespass also ?*

If so, then the objects were the same, just as the parties were the same. The court of law, by the former judgment, decided that the acts of the appellant in the premises were no unlawful invasion and trespass on the lands of the complainant, but was *damnum absque injuria.* *That judgment should prevail.* *"Expedit reipublicæ ut sit finis litium."*

III. The circuit court erred in its decree wherein it construed appellant's muniments of title to the easement of the water power of Mill creek, as vesting in him the authority to use only so much of the water as he could raise from the creek into the ditch, and in that way convey to his mill, by means of the dam at the willow, as it originally was, and by that means alone; thus *holding,* in effect, that the general grant of easement expressed by the comprehensive words, *"and the entire and exclusive use of the water,"* was designed to be narrowed down to a limited easement by the particular grant of a certain ditch and dam which precede and succeed it.

Yet, can it be denied that, had· those comprehensive words, "entire and exclusive use of the water," *alone* been employed, they would have carried with· them, *ex neecssitate,* all the incidents and privileges connected with the general easement and essential to its enjoyment, and would have embraced, *not only that special ditch and dam,* but any and all others which might be necessary, or even suitable and convenient, and the selection and adoption thereof by appellant only be restricted to an observance of the golden rule of the law, "*sic utere tuo ut non lœdas alienum.*"

The general grant of easement once made, the particulars enumerated would necessarily have passed by implication of law. And here steps in the rule of construction, viz : "The expression of those things which the law implies; works nothing," neither *to diminish* nor *to enlarge.* This rule is the more applicable where, as in this case, there is nothing in the enumeration of the particulars expressly limiting the effect of ·the words which create the general easement. 2 Parsons on Contracts (6th ed.), 515.

The dam, the water, and the race would all have passed by the grant of "mills," *without more.* See Angel on Water Courses, § 153 a, § 144 and § 159 ; High on Inj'rs, § 563.

To measure the extent of his water rights in the premises, appellant stands wholly on his original muniments of title, unaffected by the compromise which occurred after the judgment in the suit at law. That judgment settled that he had done no injury for which damages could be demanded of him. And the compromise only settled that appellant was to demand no damages for the injury done him by the change in the creek's channel efected by appellee's predecessor.

*Edmund Pendleton* and *F. T. Glasgow,* for appellee.

LEWIS, J., delivered the opinion of the court.

The controversy in this case grows out of the erection and maintenance by the appellant of a certain dam across Mill creek, in Botetourt county, a stream flowing through the lands of the appellee, and upon which stands the mill of the appellant.

The prayer of the bill is for an injunction to restrain the appellant, the defendant below, from further repairing and maintaining said dam, and also that he may be required to remove the same.

Both parties derive title from John Beale, who died about the year 1810. Soon after his death, his land was partitioned among his heirs by commissioners appointed by the county court of Botetourt county, and was divided into four parcels. Lot No. 1, the uppermost on Mill creek, containing 171 acres, was allotted to Robt. Beale; lot No. 2, containing 182½ acres, the next below, to George Beale; lot No. 3, the next, containing 231½ acres, to Mary Beale; and the next, lot No. 4, containing 3 acres. with mill and appurtenances, was reserved to be held in common by the widow and heirs of John Beale.

The head of the race through which the water flows from the creek to the mill is on the tract allotted to Robt. Beale, and before reaching the mill passes through the other tracts just referred to. In their report to the county court, which was adopted, the commissioners say: "It is our opinion, and we direct, that the water in the race be not under the control of the different proprietors of the land, but be considered as part of the property held in common."

By successive conveyances the tracts allotted to Robt. and Geo. Beale, respectively, are now owned by the appellee, and lots Nos. 3 and 4 are now owned by the appellant.

In the year 1818, the widow conveyed her interest in the mill property, "together with her right to the use of the water, *the dam* and race."

About the same time, all the heirs of John Beale, except Robert, conveyed their interests in the mill property and their right to "the ditch which conducts the water to the mill and the entire and exclusive use of the water and *the dam* by which the water is raised from the creek to the ditch."

Afterwards, in 1825, Robt. Beale conveyed his interest in the same property, together with "his interest in the ditch, dam, and water appurtenant to said mill."

By the words quoted from the report of the commissioners and the said conveyances, the easement on the lands of the appellee was created and defined.

At the time those conveyances were made, and in fact before the death of John Beale, the dam by which water from Mill creek was supplied for the mill was at a point on the creek (designated in the record as the rock and willow) about 50 yards distant from the head of the race. It was built on a solid limestone rock foundation, was easily kept in repair, and furnished an ample supply of water for the operation of the mill. Its foundation is the only solid foundation for a dam on appellee's lands, and is superior to any location above. At a point between 80 and 100 yards above this dam the natural flow of water in the creek makes a detour, somewhat in the shape of an irregular horse-shoe, near the lower heel of which is the head of the mill-race. In the year 1860, C. C. Spears, the grantor of the appellee, in order to straighten the channel of the creek, cut a ditch through which the water flowed in a straight line from the upper end of the curved channel to the dam referred to. The result was to greatly increase the velocity of the flow of water in the creek, and thereby often to cause the bed of the dam to fill up in large measure with mud, gravel, and stone. This greatly interfered with and at times prevented a sufficient flow of water into the race for the operation of the appellant's mill, and thereby occasioned him in-

convenience, labor and expense.   In course of time the dam
itself was swept away.   Accordingly, about the year 1870,
the appellant, in order to restore the flow of the creek into
its original crooked channel, erected a dam at the head of
the Spears' cut, and about the same time another dam across
the channel just at the head of the mill-race.   Thereupon
the appellee, complaining that his lands were injured in
consequence of the erection of the dam last referred to,
sued the appellant at law to recover damages; but judg-
ment in that suit went against him.   The parties, then, in
order to finally settle their differences, entered into a com-
promise agreement.   The appellant claimed that *he* had
been injured by the change made in the channel of the
creek by the appellee's grantor, Spears, and claimed com-
pensation for the injury, and also for the restitution of the
channel and flow of the water as it was before the change
was made.   It was, therefore, agreed that the appellee
should pay the appellant $500, and the costs of the suit at
law, and the sum of $200 for counsel fees; the appellant
agreeing in consideration thereof, at his own cost, to restore
the flow of water as it originally was.   It was expressly
stipulated that the appellant's rights to the water should
remain as they were before the change was made by Spears
in 1860, and unaffected thereby.

The dam erected by the appellant at the head of the
ditch is on an alluvial foundation.   It is constructed by
placing logs across the creek, penetrating each bank, and
then lined with brush and covered and packed with allu-
vial earth taken from the appellee's land at that point.   It
is built obliquely across the channel of the creek, is higher
than was the original dam, 50 yards below, at the rock and
willow, and is higher than is necessary to turn into the
race a supply of water for the mill, and often turns into
the race a quantity of water greater than its capacity will
convey to the mill.

The consequence is that the land of the appellee is frequently overflowed and injured by the water that escapes over the banks of the race. Moreover, the appellee complains, and the testimony shows, that he is subjected to annoyance and his land to further injury by the frequent hauling over it by the appellant of materials for the repair of the dam, which, being constructed in the manner and of the material described, is often out of order and in need of repairs. In repairing it, the soil of the appellee is shovelled upon the dam, often in large quantities, which causes the banks to wash, and thus occasions damage, and threatens still further damage to the appellee.

The appellant demurred to the bill; and in his answer he insists that he had the entire and exclusive right to the water of Mill creek passing through appellee's lands; that he ought not to be restricted to a dam at the rock and the willow as it originally stood; and that he has not invaded the rights of the appellee. He insists that the judgment at law and the said compromise agreement constitute a full and final bar to the maintenance of this suit against him.

Upon the hearing the court below overruled the demurrer, and being of opinion that the appellant had no right to raise water from the creek into the race, except by means of a dam as it originally was at the rock and willow, ordered that the appellant remove the dam at the head of the race within a certain time, and all obstructions placed by him in the original channel above the old dam, but decreed that he be allowed to rebuild the dam at the old site, and of the heighth of the old dam, and no higher. From this decree an appeal was allowed by one of the judges of this court.

In the petition for an appeal there are three assignments of error:

1. That the court erred in overruling the demurrer, as the case is not within the jurisdiction of a court of equity.

2. That the court erred in ignoring and failing to pass on the plea of "former judgment."

3. That the court erred in construing the appellant's muniments of title to the easement of the water power of Mill creek and his rights thereunder.

These assignments will be noticed in the order in which they are presented.

1. The jurisdiction of a court of equity to interfere by injunction, in the case of nuisance, trespass, and the like, to restrain irreparable mischief, to suppress oppressive litigation, or to prevent a multiplicity of suits, is too well established to admit of doubt. In the case of *Hanson* v. *Gardener*, 7 Vesey, 305, an injunction was granted where the defendent claimed common of pasture and estovers; and in that case Lord Eldon observed that the law as to injunctions had changed very much, and that they had been granted much more liberally than formerly; that they were granted in trespass when the mischief would be irreparable, and to prevent a multiplicity of suits. In High on Injunctions, § 516, it is said that where an injunction is sought to prevent interference with the enjoyment of property by the erection of a dam, equity will not be governed by the mere value of the property, nor will relief be denied because complainant's title has not been established in an action at law, since the modern doctrine of courts of equity is much more liberal than the ancient. * * * Therefore a bill to enjoin the further construction and maintenance of a mill dam is not demurrable for want of equity, in that it contains no allegation of complainant's right having been established in a suit at law.

In the case of *Burwell* v. *Hobson*, 12 Gratt. 322, this court decided that it was within the jurisdiction of a court of equity not only to enjoin the further erection of a dyke, the effect of which was to overflow the lands of the plaintiff, but to cause an abatement to be made of the dyke al-

ready constructed, or so much thereof as had the effect of injuring the land of the plaintiff.

In the case of *Hanna* v. *Clark and others*, 31 Gratt. 36, in which the controversy grew out of the right of the parties to the use of the water in a certain dam for the operation of their respective mills, this court reversed the decree of the circuit court, because, instead of turning the parties out of a court of equity (as it did), in which their controversy was pending and might have been settled in a single suit, and leaving them to their remedy at law, it ought to have proceeded, according to the prayer of the bill, to ascertain, define and settle the rights of all parties to the use of the water, and to grant such other and further relief as the nature of the case required, &c. See also opinion delivered by Judge Burks in *Sanderlin* v. *Baxter, supra*, p. 299.

The case of the appellees here comes within the rule laid down by these authorities, and the demurrer to the bill was, therefore, properly overruled.

2. As to the second assignment of error, it is sufficient to say that the compromise agreement between the parties was entered into after the judgment at law referred to was rendered. And the effect of that agreement was to remit the parties to their original rights as they existed before the change in the channel of Mill creek was made by Spears, in 1860.

3. The court did not err in construing the appellant's muniments of title to the easement in the water power of Mill creek. The easement was created and defined by the terms of the report of the commissioners of the county court in 1810, and by the subsequent conveyance of the widow and heirs of John Beale, to which reference has already been made. At that time the dam was at the rock and willow, and the grantees of John Beale's heirs acquired the right to the mill race and the entire and exclusive use of the water, which could be raised into the ditch by means

of the dam as it then stood. Nothing more was conveyed, and nothing more was intended to be conveyed. The appellant, therefore, has no right to erect other dams at other points on the creek, or otherwise than by a dam at the original site to raise water from the creek into his mill race.

The testimony in the cause is voluminous, covering an hundred pages of printed record, and much of it is conflicting. It is unnecessary to review it. We have examined it carefully, and are satisfied with the conclusion to which we have arrived.

There is no error in the decree of the circuit court, and the same is affirmed.

DECREE AFFIRMED.