# Staunton

RACHEL V. MULLINS, ET ALS. V. F. E. MORGAN AND
NAAMAN MORGAN.

September 5, 1940.

Record No. 2259.

Present, Campbell, C. J., and Holt, Hudgins, Gregory,
Eggleston and Spratley, JJ.

The opinion states the case.

*F. H. Combs,* for the appellants.

*Roland E. Chase, W. A. Daugherty* and *R. E. Williams,* for the appellees.

CAMPBELL, C. J., delivered the opinion of the court.

Appellants instituted this suit against appellees in the Circuit Court of Buchanan county. The object of the suit was to enjoin appellees from the further construction of a large building situated on the south side of Slate Creek and to compel the removal of a concrete wall eight or ten feet high, erected by appellees, which extends out into the creek for a distance of eleven feet.

The material allegations of the bill of complaint are that appellants are the owners in fee of certain real estate situated in the town of Grundy; that said tracts or parcels of land are situated along and border on Slate Creek; that the channel of Slate Creek was seventy-four feet wide; that appellees are erecting a building on the south side of Slate

Creek, and have, by the erection of a concrete wall, encroached upon the channel of Slate Creek to the extent of eleven feet, thereby diverting the flow of water in the channel of the creek and exposing the properties of appellants to the hazard of inundation and damage in time of high waters; and that said wall constitutes a nuisance.

The court granted a temporary injunction, but upon the final submission of the case on bill, answer and depositions, a decree was pronounced refusing a permanent injunction and dismissing the bill of complaint. From this decree appellants have been allowed an appeal.

It is conceded by counsel that the case falls within narrow limits and is to be determined by a decision of two issues, *viz:* Have appellees, in the erection of the concrete wall in the channel of Slate Creek to the extent of eleven feet, created such a nuisance as entitles appellants to injunctive relief? Have appellants been guilty of laches in the prosecution of their suit seeking relief?

The evidence that appellees have encroached upon the channel of Slate Creek preponderates in favor of appellants. If there was any doubt about this conclusion, it has been settled by the trial court. In a written opinion, the trial court has reached a conclusion upon both of the issues involved in this case. The opinion is brief and is as follows:

"It is quite clear from the evidence that the creek bed just below the bridge recently constructed had a clearance of about seventy-seven feet in width and that defendant, Morgan, in the construction of the foundation for his building went out into the bed of the creek 10 or 11 feet, thus taking about one-seventh of the creek bed, which, of course, considerably lessened the carrying capacity of the creek bed at this point. However, it is contended by the defendant that the part of the creek bed not thus appropriated is amply sufficient to carry all of the water in Slate Creek in time of tide low or high. This contention is seriously controverted by complainants and constitutes their chief ground for asking the aid of a court of equity.

"Complainants assume the burden of proving that the flow of the water down Slate Creek is and will be seriously hampered by act of the defendant to their detriment.

"In support of this contention the complainants and certain other witnesses testify that in their opinion and from their observation of this creek in the past the channel left open is not sufficient to carry the water in time of high tide and that same will be diverted over on to their land thereby damaging same.

"The defendant counters chiefly with the testimony of a skilled engineer who after taking various measurements and after making neat calculations gives it as his opinion that the creek bed in its present condition is sufficient to carry the flow of water at all times. He backs this up with rather strong and persuasive figures and illustrations.

"Thus the case comes to the court in a state highly problematical and none can say with any degree of certainty as to which contention is right without an actual test and this has not yet come.

"The court must either perpetuate the injunction or dissolve the same and dismiss the bill." (Citing authorities.)

\*     \*     \*     \*     \*     \*     \*

"The court is of opinion under this evidence that in defendant Morgan's construction work he went out entirely too far into the creek bed and that if the case had been presented before the work was done it would have been seasonable and proper to have granted a perpetual injunction, but as the case now stands the court views it in a much more unfavorable light.

"Counsel for defendant contends that complainants are guilty of laches and that their conduct invokes equitable estoppel against them. Complainants' counsel presents an extensive brief in an effort to show that these defenses are not proper to be invoked in this case.

"Strictly speaking it may be that complainants are not guilty of laches and that their conduct does not justify an equitable estoppel, but however it may be, the Court is

clearly of the opinion that complainants were guilty of, for lack of a better name, we will call it procrastination, greatly to the injury of the defendant.

"Complainants had ample time to have acted earlier and justice and fair play loudly called upon them to act and act promptly if they meant to interpose objection to this work. Thus they could have saved defendant of an expenditure of at least three thousand dollars, which they now ask to destroy.

    \*      \*      \*      \*      \*      \*      \*

"True, complainants did not wait for any great length of time, but time is not the determining factor in a case of this kind. They knew their rights and if they were being violated or infringed upon it was certainly open and obvious. They were bound to know that the defendant was preparing to expend large sums of money and they owed it to him to enter a solemn protest and if this failed they should have gone into court which they certainly could have done, and it was their solemn duty to have done without waiting until defendant had done work which it would now cost him thousands of dollars to undo.

"It is claimed that they did protest but the evidence fails to disclose any protest. It does show that certain of the complainants had informal talks with the defendant in which they suggested that he was building too far out into the stream and that it might throw the water over on them, to which he replied that he did not think it would do so but if it did he would pay the damage and here the discussion ended. Two of the complainants most vitally concerned, Anderson and Jackson, saw the work progress from start to finish and they never one time mentioned the matter to the defendant.

"This inexcusable delay bears mightily upon the conscience of this court in the exercise of the court's discretion in the perpetuation or dissolution of the injunction, in fact, it is the deciding factor. The court cannot escape the conclusion that to perpetuate this injunction would be inequitable and unjust.

"Having reached this conclusion a decree may be prepared dissolving the injunction and dismissing the bill, but without prejudicing the right of complainants to sue at law for any damage they have sustained, are sustaining or may sustain in the future should they be so advised."

As the opinion of the trial court is the main reliance of appellees, we deem it proper to analyze it carefully. We concur in the conclusion that the evidence clearly demonstrates that appellees have encroached upon the channel of Slate Creek to the extent of ten or eleven feet and that such encroachment "considerably lessened the carrying capacity of the creek bed at this point". The fact that appellants' properties have not as yet been damaged is beside the mark. When confronted with a nuisance and threatened with the destruction of his property, a person does not have to await the actual infliction of damage upon his property, but has a right, when the potential danger arises, to appeal to a court of equity for relief, if such appeal is seasonably made.

In *Carpenter* v. *Gold,* 88 Va. 551, 553, 14 S. E. 329, it is said:

"Accordingly, the diversion of a natural stream is a private nuisance, and therefore, from an early period, courts of equity have granted relief by way of injunction, in such cases, at the suit of the injured party. The jurisdiction is founded upon the notion of restraining irreparable mischief, or of preventing vexatious litigation, or a multipicity of suits. And where the complainant's legal right is clear, and the case is one 'of strong and imperious necessity'; or, in other words, where the right is clear, and its violation palpable, and the complainant has not slept upon his rights, equity will ordinarily interfere, although the right has not been established at law; and in such a case a preliminary mandatory injunction, as it is called, will be granted, which is so framed that it restrains the defendant from permitting his previous act to operate, and, therefore, virtually compels him to undo it—that is, to restore the water to its natural channel. 1 High, Inj. (3rd Ed.), sec.

804; *Gardner* v. *Newburgh*, 2 Johns, Ch. 162 [7 Am. Dec. 526]; *Corning* v. *Troy Factory*, 40 N. Y. 191; *Webb* v. *Portland Manf'g Co.*, 3 Sumn. 189; *Hanna* v. *Clark*, 31 Gratt. [72 Va.] 36; *Parker* v. *Manf'g Co.*, 2 Black, 545 [17 L. Ed. 333]; *Switzer* v. *McCulloch*, 76 Va. 777."

In *Leonard* v. *St. John*, 101 Va. 752, 45 S. E. 474, Judge Cardwell said:

■ "No lapse of time will bar the owner of land of the right to have a stream flow through the same in its natural bed or channel, as he holds that right by the same title that he holds his land, * * * ."

■ On the question of laches, we are in accord with the conclusion of the trial court that "complainants are not guilty of laches and that their conduct does not justify an equitable estoppel * * * ." We are unable to concur in the conclusion that appellants have been guilty of "procrastination", a term, in our opinion, which has no foundation in law or equity.

The record demonstrates that appellees began the construction of the offending wall on May 1, 1939. The day after the work of digging a ditch for the foundation was begun, George Belcher, one of the appellants, interviewed F. E. Morgan in regard to the encroachment upon the creek channel. Belcher's evidence on this score is as follows:

"Q. Does this wall they put in there, the wall Mr. Morgan has built, is it located in what was the bed of Slate Creek at ordinary times before that wall was put there?

"A. Yes.

"Q. Did you talk to Mr. Morgan about putting this wall there or were you present when anybody else talked to him and made any objection to it at the beginning?

"A. Yes, sir, I come up there the next day after he started work and talked to him.

"Q. What was said?

"A. I told him he was putting the wall too far out, that it would probably wash our lots off, and he said, 'I think not, I don't think it would.' He said he had been up the creek and had measured the width of the creek about two

miles up the creek, said he measured it up at this bridge out here and one up at Stuart Ratliff's, and said he didn't think it would damage me any, and if it did, he would pay.

"Q. Did you still protest or consent?

"A. Still protested or we wouldn't have this suit here.

"Q. Did he stop?

"A. No, he didn't stop.

"Q. Did you talk to other land owners about it?

"A. Yes, sir, I talked to Mr. Ratliff and Mr. Mullins, but right at that time, Mr. Mullins was away.

"Q. Mr. Mullins wasn't here at the time he started the work?

"A. No, he wasn't."

George Mullins, one of the appellants, testified that he was absent in West Virginia when appellees began the construction of the wall, but upon being notified to that effect, he returned to the town of Grundy and immediately consulted with his associates as to the course to be pursued; that it was decided to confer with F. E. Morgan in regard to the matter. His evidence is as follows:

"Q. Did you talk to him?

"A. Yes, sir, I did and talked to him and told him that he was building his wall too far over, that it was going to damage us.

"Q. What did he say?

"A. He said he was willing to pay the damage.

"Q. But he wanted to put the wall in?

"A. I don't know he said anything more than he came down there where we were measuring the distances—George Belcher and I and Anderson and Ratliff were down there and Morgan came down there and talked awhile to Mr. Belcher and me.

"Q. You let him know you protested against his putting it there?

"A. Yes, sir.

"Q. And he finished it after that?

"A. They were working on the wall that day and finished it, I suppose they finished it.

"Q. If there is anything else you think of you want to say, you go ahead and state it, I don't think of anything else.

"A. I know one thing, that property I have over there— I have a lot coming out there, the creek will cover about half that, and at that time Mr. Morgan pointed out that I could build out to the end of that lot, I said, 'I don't want to build out there, I don't figure on building at the end of my lot.'

"Q. Building a wall?

"A. Yes, sir, on the property line and I said 'I don't want to do that.'"

A. M. Ratliff, one of the appellants, testified as follows:

"Q. Do you or your wife own the brick building, which Mr. V. C. Smith does business in?

"A. Yes.

"Q. Did you purchase your lots from Mr. George W. Mullins or his wife?

"A. Yes, sir.

"Q. When the defendant started this work, putting in this wall, did you talk to him any about it?

"A. Yes, sir, I was down there one time and Vance Shortt was there working but the next day I went back and talked to Mr. Morgan about it.

"Q. About how far had they progressed with the work at that time?

"A. They had commenced digging the ditch, maybe dug 8 or 10 feet, but the first day I was there, they were cutting the ditch and moving the water over, the water was flowing against the wall.

"Q. Do you mean the old rock wall that was there?

"A. Yes, sir.

"Q. And before he did any work on the wall he cut the ditch?

"A. Yes, sir, he had to cut that ditch before he could get to work there, it was in his way, the creek was.

"Q. What did you say to him about it?

"A. I don't remember how we raised the conversation, he said he didn't think it would hurt us. Mr. Belcher had

been there and he said he told Uncle George if it did do any damage, he would help build or pay for a wall on the other side.

"Q. Did you let him know you objected to his building the wall there?

"A. Yes, sir, or he wouldn't have made that remark to me.

"Q. Did he stop?

"A. No, he worked on."

After realizing that appellees would persist in building the wall, appellants employed counsel and the bill for injunction was filed on May 24, 1939.

If it be conceded that by waiting three weeks after making protest appellants were dilatory in asserting their rights, the record shows that appellees were most diligent in constructing the wall, as same was completed on the night of May 22, 1939.

■■ In criticizing appellants for what is termed "inexcusable delay", the trial court overlooks the progressive step Virginia has made in providing a simple and expeditious procedure for the assertion of legal rights. Since the enactment of section 6140a of the Code, known as the "Declaratory Judgment Statute", it is as much incumbent upon an alleged wrongdoer to assert his rights in a court of law as it is incumbent upon one whose alleged rights are being violated to assert them in a court of equity. If the law places upon a litigant the burden to "protest" more emphatically than appellants protested, then we are not cognizant of such a rule. After knowledge that a controversy has arisen, the duties of the respective parties are reciprocal. Whether appellees acted contumaciously or upon bad advice is not disclosed by the record. That they acted illegally is demonstrated by the record. The fact that they expended money unwisely is a risk they assumed, for which there is no relief. This is the settled rule in this Commonwealth.

In *Virginian Railway Co.* v. *Avis*, 124 Va. 711, 98 S. E. 638, this court affirmed a decree of the lower court enjoining the use and occupation of "a warehouse, a store house,

a shed and cotton gin" erected upon the lands of Avis, with his knowledge but without his consent.

In *Cheatham* v. *Taylor,* 148 Va. 26, 138 S. E. 545, it appears that Cheatham, at considerable expense, after protest by Taylor, erected an addition to the front of his drug store situated on Rivermont Avenue in the city of Lynchburg, in violation of the residential rights of Taylor. The lower court, by decree, granted the prayer of the bill for the removal of the fifteen foot front of the drug store and this court affirmed that decree.

In *Springer* v. *Gaddy,* 172 Va. 533, 2 S. E. (2d) 355, this court reversed the decree of the lower court permitting Gaddy to maintain a building which he had erected at great cost, in violation of the rights of Springer, and entered a decree responsive to the prayer of the bill for injunctive relief.

The decree of the lower court will be reversed and annulled and this court will enter a decree in conformity with the prayer of the bill of complaint.

*Reversed.*