# Richmond

## THE TOWN OF PURCELLVILLE, A MUNICIPAL CORPORATION v. CLARENCE H. POTTS AND SARAH E. POTTS.

April 13, 1942.

Record No. 2484.

Present, All the Justices.

The opinion states the case.

*Charles Pickett* and *Stilson H. Hall*, for the appellant.

*Amos C. Crounse* and *J. Foster Hagan*, for the appellees.

EGGLESTON, J., delivered the opinion of the court.

Clarence H. Potts and Sarah E. Potts, hereinafter called the plaintiffs, filed their bill in the court below against the town of Purcellville, alleging that they were the owners of a tract of some 300 acres of land situate in Loudoun county, Virginia, through which ran, in a well-defined channel, a stream, popularly known as "Laurel Branch," having its origin in springs on the eastern slope of the Blue Ridge Mountains to the west of their property; that the town of Purcellville had constructed dams across the two tributaries of the stream above their property; that it was thereby impounding a large volume of the water, and diverting it from its natural channel running through their property, and was conducting it to a large reservoir whence it was piped into the town and distributed to its inhabitants and customers, and that as a result thereof the riparian rights of the plaintiffs had been violated and their property greatly damaged, and particularly that the usefulness of the fields through which the stream had formerly run had been destroyed as watering places for their cattle and livestock.

The bill prayed for a mandatory injunction requiring the town to demolish and destroy the dams in order that the water from the stream might flow uninterruptedly in its course and channel through the plaintiffs' land; that the plaintiffs might have a judgment against the town for the damages suffered by the invasion of their rights and the diminution of the value of their property.

The town demurred to the bill on the ground, among others, that the plaintiffs had an adequate remedy at law. The demurrer was overruled and the town answered admitting the construction of the dams and the water system, but denying that the plaintiffs had been damaged or that the flow of the water through their land had been interrupted or diminished. In an amended answer the town asserted the further defense that the plaintiffs were guilty of laches which estopped them from claiming equitable relief in the present suit.

After the evidence had been heard *ore tenus* the lower court entered a final decree sustaining the prayer of the bill for a mandatory injunction requiring the town to demolish the dams against which the principal complaint had been made, but denying the sundry prayers for monetary damages. The injunction, however, was suspended for a period of sixty days in order that the town might, if it were so advised, institute condemnation proceedings for the purpose of acquiring the water rights of the plaintiffs in the stream. From this decree the town has appealed.

[■] Since the finding of the trial court is based on evidence taken *ore tenus*, all conflicts have been settled in favor of the plaintiffs. Consequently, we state the evidence from the standpoint most favorable to them. *McDaniel* v. *Hodges,* 176 Va. 519, 521, 11 S. E. (2d) 623; *County of Henrico* v. *City of Richmond,* 177 Va. 754, 782, 15 S. E. (2d) 309, 318.

About one-half of the plaintiffs' tract of 300 acres is cleared. Through two of the fields, aggregating 50 acres, runs "Laurel Branch," a stream which flows in an eastwardly direction in a well-defined channel. It furnishes water for a small number of cattle which the plaintiffs have raised. Before reaching the western boundary of the plaintiffs' prop-

erty this stream consists of two smaller streams, both of which flow through lands owned by the town and apparently acquired by it as a watershed. The larger of these tributaries originates in "Davie Potts Spring" to the north of the town's property. The other tributary has its origin in a spring or springs on the town's property. The town has constructed on its own property dams across each of these tributaries. From these dams water is piped by gravity to a reservoir from which it is taken into the town and distributed to its consumers.

Until the need of the town is satisfied none of the water is allowed to escape over the spillways at the dams. While, perhaps, in some seasons there is a sufficient quantity of water to satisfy the needs of both the town and the plaintiffs, during the summer months, particularly in August and September, the town consumes practically all of the water, and none is allowed to escape over the dams to run into the channel which passes through the plaintiffs' property. That this situation is very injurious to the property of the plaintiffs, the evidence plainly shows.

The town's pipes running from the dams to the reservoir cross the property of the plaintiffs, and for this purpose an easement was condemned. However, no condemnation proceedings have been instituted to acquire the plaintiffs' rights in the stream which the town has thus diverted.

The town's water system was completed at a cost of approximately $87,000, and was put in operation in August, 1930. The plaintiffs' bill was filed in December, 1931.

Both the plaintiffs and the town are riparian owners of the lands through which the stream here runs, and as such their rights and duties toward each other are well fixed. As is said in Minor on Real Property, 2d Ed., sec. 55, p. 76:

"The well settled general rule on this point is that each riparian proprietor has *ex jure naturae* an equal right to the reasonable use of the water running in a natural course through or by his land for every useful purpose to which it can be applied, whether domestic, agricultural or manufacturing, provided it continues to run, after such use, as it is

wont to do, *without material diminution* or alteration and *without pollution;* but he cannot diminish its quantity materially or exhaust it (except perhaps for *domestic* purposes and in the *watering of cattle*) to the prejudice of the lower proprietors, unless he has acquired a right to do so by grant, prescription or license."

See also, *Hite* v. *Town of Luray,* 175 Va. 218, 225, 8 S. E. (2d) 369, 371-2; *Mumpower* v. *City of Bristol,* 90 Va. 151, 153, 17 S. E. 853, 44 Am. St. Rep. 902.

■ While a riparian owner is entitled to a reasonable use of the water, he has no right to divert it for use beyond his riparian land, and any such diversion and use is an infringement on the rights of the lower riparian proprietors who are thereby deprived of the flow. Such a diversion is an extraordinary and not a reasonable use. See *Town of Gordonsville* v. *Zinn,* 129 Va. 542, 558, 106 S. E. 508, 14 A. L. R. 318; *Roberts* v. *Martin,* 72 W. Va. 92, 77 S. E. 535, 537.

In the recent case of *Pernell* v. *City of Henderson,* 220 N. C. 79, 16 S. E. (2d) 449, 451, it is said:

■ ■ "It has been held with practical unanimity that a municipal corporation, in its construction and operation of a water supply system, by which it impounds the water of a private stream and distributes such water to its inhabitants, receiving compensation therefor, is not in the exercise of the traditional. right of a riparian owner to make a reasonable domestic use of the water without accountability to other riparian owners who may be injured by its diversion or diminution. 'The use of the waters of a stream to supply the inhabitants of a municipality with water for domestic purposes is not a riparian right.' 67 C. J. 1120. 'The weight of authority * * * holds a municipal corporation civilly liable for diverting the waters of a private watercourse for the purposes of a public water supply, either with or without legislative authority.' 19 R. C. L. 1096. 'A municipal corporation will be liable for diverting the waters of a stream or watercourse and depriving lower riparian owners of the use thereof.' McQuillin, Municipal Corporations, Vol. 6,

pp. 1251, 1252." Other authorities supporting this view are collected in the opinion.

■ ■ These principles apply to the situation before us. They apply not only to the larger tributary, but also to the smaller stream which has its origin in, the springs on the town's property. As was said in *Roberts* v. *Martin, supra* (77 S. E., at page 538): "Though the diversion of the water is made from a spring, yet it appears clearly that the spring is a source of the stream. Therefore, a diversion of the water from the spring is nevertheless a diversion of the stream." See also, 2 Farnham, Waters and Water Rights, sec. 464, p. 1574.

In *Carpenter* v. *Gold*, 88 Va. 551, 553, 14 S. E. 329, we said:

■ " * * * the diversion of a natural stream is a private nuisance, and, therefore, from an early period, courts of equity have granted relief by way of injunction, in such cases, at the suit of the injured party. The jurisdiction is founded upon the notion of restraining irreparable mischief, or of preventing vexatious litigation, or a multiplicity of suits. And where the complainant's legal right is clear, and the case is one 'of strong and imperious necessity'; or, in other words, where the right is clear, and its violation palpable, and the complainant has not slept upon his rights, equity will ordinarily interfere, although the right has not been established at law; and in such a case a preliminary mandatory injunction, as it is called, will be granted, which is so framed that it restrains the defendant from permitting his previous act to operate, and, therefore, virtually compels him to undo it—that is, to restore the water to its natural channel." (Citing authorities. )

This principle was recently approved by us in *Mullins* v. *Morgan*, 176 Va. 201, 207, 10 S. E. (2d) 593, 596, 131 A. L. R. 785. See also, *Masonic Temple Ass'n* v. *Banks*, 94 Va. 695, 696, 27 S. E. 490; *Roberts* v. *Martin, supra* (77 S. E., at page 538); 27 R. C. L., Waters, sec. 64, p. 1134.

[■ The fact that the wrongdoer here is a municipality, clothed under the Constitution and statutes of the State with

the power of acquiring the plaintiffs' riparian rights by eminent domain, does not relieve it from the application of these principles. See *Town of Gordonsville* v. *Zinn, supra; Robertson* v. *Arnold,* 182 Ga. 664, 186 S. E. 806, 809, 106 A. L. R. 681, and authorities there cited; 1 Farnham, Waters and Water Rights, sec. 137, pp. 609, etc. Indeed, the fact that the town here might have acquired such riparian rights of the plaintiffs in a lawful manner makes all the more inexcusable its undertaking to do so in an unlawful manner.

The learned counsel for the town contend that the plaintiffs have been guilty of laches which will estop them from claiming injunctive relief in a court of equity. It is argued that they silently stood by and watched the town expend a large sum of money in constructing its water supply system, including the dams complained of, and delayed bringing the present suit until after the system had been completed and put into operation. Hence, they say, since the plaintiffs were silent when they should have spoken, they are precluded from relief in a court of equity.

But it is not true, as the town contends, that the plaintiffs stood silent. On the contrary, Clarence H. Potts testified, without contradiction, that he did protest, and that he was told by counsel for the town, as well as by his own attorney, that he would not be entitled to injunctive relief until after the system had been completed and put into operation. Apparently this was on the theory that until then the plaintiffs could not tell how much of the water would be diverted by the town and what would be the extent of their damage, if any.

Whether this position was legally correct we need not stop to inquire. But certainly the conduct of the plaintiffs was such as to put the town on notice that they were not acquiescing in its invasion of their rights, and that hence the improvements were being made by the town at its own risk. See *Patterson* v. *East Jersey Water Co.,* 74 N. J. Eq. 49, 70 A. 472 (affirmed, 77 N. J. Eq. 588, 78 A. 1134).

It is argued that the plaintiffs are not entitled to relief because they have not shown that they have suffered any

monetary damage. But, as was pointed out in *Roberts* v. *Martin, supra* (77 S. E., at page 536), a diversion of a natural watercourse, though without actual damage to a lower riparian owner, is an infringement of a legal right and imports damage, and that infringement a court of equity will prevent. See also, 27 R. C. L., Waters, sec. 65, p. 1134; Minor on Real Property, 2d Ed., sec. 55, p. 77.

The appellant complains of the reservation in the final decree that nothing therein "shall be construed as preventing the owners of the land herein from presenting in any condemnation proceeding that may hereafter be instituted by the defendant, any claim for damage to the land in the depreciation of the value thereof."

It is argued that the plaintiffs failed to prove any such damage in the present proceeding, that this is borne out by the fact that the court expressly disallowed the claim in the decree, and hence that the matter is *res judicata* and can not be asserted in any subsequent condemnation proceeding.

There is no merit in this contention. Assuming, but not deciding, that the court might have awarded damages in the present proceeding, it is manifest from the decree, read as a whole, that that matter was not passed upon, but was deferred for consideration in condemnation proceedings. Matters raised before the court but not passed on by it and expressly reserved for further consideration are not *res judicata*. 30 Am. Jur., Judgments, sec. 181, p. 927; 2 Freeman on Judgments, 5th Ed., sec. 704, p. 1487.

Finally, it is argued that to carry out the court's decree may result in a great hardship to the large number of inhabitants of the town. This would be true if the decree presented no alternative to the removal of the dams. But this is not the situation, for, as we have seen, the court suspended the operation of the mandatory injunction for a reasonable time in order that the town might proceed to acquire the riparian rights of the plaintiffs in a lawful manner, that is, by condemnation proceedings. If this procedure is followed there will, of course, be no necessity for the destruction of the dams, and the water supply will be in no way impaired.

 On the whole we are of opinion that the trial court · made a fair and equitable disposition of the matter in controversy before it. The decree appealed from suspends the operation of the mandatory injunction until May 1, 1941, in order that the town be given an opportunity, as we have stated, to institute condemnation proceedings. Pending this appeal that date was passed. Accordingly, the decree will be modified to provide that the injunction shall not become effective until June 15, 1942, for the same purpose and upon the same condition, and as so modified it will be affirmed.

*Modified and affirmed.*